NO. 4-00-0641

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

STEPHEN BRIGGS,

Plaintiff-Appellee,

v.

THE STATE OF ILLINOIS; GEORGE RYAN, Governor; and JESS MCDONALD, Director, Department of Children and Family Services,

Defendants-Appellants.

)

)

)

)

)

)

)

)

Appeal from

Circuit Court of 

Sangamon County

No. 99MR285

Honorable

Thomas R. Appleton,

Judge Presiding.

_________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

In April 1998, the Department of Children and Family Services (DCFS) indicated a report of child abuse against plaintiff, Stephen Briggs, a first-grade teacher of children with behavioral disorders, arising from an incident with one of his students.  In October 1998, DCFS denied plaintiff's request to expunge the indicated report.  Plaintiff requested a full hearing before an administrative law judge (ALJ), which DCFS conducted in February 1999.  On June 15, 1999, the ALJ recommended that the Director of DCFS (Director) deny plaintiff's request for expungement of the indicated report.  On June 23, 1999, the Director denied plaintiff's request.  In July 1999, plaintiff filed a complaint for judicial review of that decision.  In June 2000, the circuit court entered an order reversing the Director's decision.  

Defendants appealed, arguing the Director's decision was not against the manifest weight of the evidence or contrary to law.  Plaintiff argues the Director's decision that plaintiff caused bruises and scratch marks to C.M. was not supported by the testimony of any witness and the bruises and scratch marks did not constitute abuse.  We affirm.

I. BACKGROUND 

In March 1998, C.M., a six-year-old boy, was a student in plaintiff's class for behaviorally disordered students at Harvard Park School in Springfield, Illinois.  On March 10, 1998, C.M. punched another student during class.  Plaintiff intervened and took C.M. to another room, the "Quiet Room."  He testified that he placed C.M. in a "basket hold" by grasping the child's hands from behind and then crossing them over his abdomen after C.M. punched another child.  

Plaintiff testified that he released C.M. to escort him to the Quiet Room.  However, plaintiff restrained him again on the way to the room, by placing one of his hands on C.M.'s shoulder at the base of his neck, while placing his other hand on C.M.'s arm.  Becky Gordon, the teaching assistant in plaintiff's classroom, stated that she observed plaintiff with his hand on the back of the child's neck when he took him to the Quiet Room.

She could not say whether it was in a forceful way or not.  Drucilla Brooks, a teacher at the school, stated that "I think he was leading him down the hall by his arm[.]  I really can't remember[.]"

Plaintiff testified that once in the room, he placed his finger and thumb on C.M.'s jawbone so they would look face-to-face.  When plaintiff released him, C.M. jumped at him and called plaintiff vulgar names.  Plaintiff left C.M. with Gordon so that he could accompany the other children to the art room.  C.M. had calmed down when he returned.  Plaintiff then placed one hand on each of C.M.'s shoulders and moved him sideways three times to show him what it felt like to be pushed.  Plaintiff then returned to his classroom.  Plaintiff testified that he raised his voice during the incident, but he denied pushing the child or grabbing him by the neck.  

Gordon stated that when she arrived at the Quiet Room 5 to 10 seconds after plaintiff did, plaintiff's hands were around C.M.'s throat, and plaintiff was shouting at C.M. from close range and asking him how he liked having someone "in his face."  Plaintiff left the room, and C.M. calmed down.  Plaintiff then returned to the room and began to push C.M. in the chest.  Plaintiff was shouting at C.M. at the time.  She noticed that C.M. had red marks on his neck, two on the front and at least one on the back of his neck, approximately the size of a quarter. Gordon then left the room and joined the children in the art room.  After the children settled down, she went to relate the incident to the principal.  Gordon returned to the art room, and C.M. arrived later. 

Two teachers who had C.M. in their respective classes later that afternoon did not notice any redness, scratches, or marks on any part of C.M.'s neck, and C.M. did not mention that his neck hurt to either teacher.  Neither teacher recalled looking at C.M.'s neck for any type of injury.

Linda Langheim worked in C.M.'s after-school program and stated that she had observed C.M. try to choke his brother on the afternoon of the incident and she saw C.M.'s brother try to push him.  She separated the boys and at that time noticed the marks on C.M.'s neck and asked C.M. about the marks.  C.M. responded that plaintiff had made the marks and not his brother.  She stated that she did not see C.M.'s brother at any point have his hands on C.M.'s neck.  Langheim stated that she did not remember seeing any scratches or marks on C.M. when he arrived for his after-school program.  She also stated that she did not have any reason to examine him upon his arrival.  

That evening, C.M.'s mother contacted DCFS and reported marks on C.M.'s neck, and that, according to C.M., plaintiff had grabbed him around the neck leaving the marks.  DCFS began its investigation the following day.

Mary Boltz, the child-protection investigator, interviewed C.M. the morning after the incident.  He stated plaintiff took him to the Quiet Room, put him in the corner, put his hands around his throat, and pushed him with both hands about five times.  Boltz noted that C.M. had two scratches resembling fingernail marks behind his right ear and small hemorrhagic spots behind his left ear and on his neck at the spine.  C.M.'s mother informed Boltz that she noticed the marks when she picked up C.M. and his brother at school, and she stated C.M. told her that plaintiff had made the marks on his neck. 

Nancy Peterson, the school principal, explained to Boltz that she has had complaints about plaintiff in the past and that on one occasion she verbally reprimanded plaintiff after she witnessed him grab a child by the arm.  Peterson also stated that the school had suspended C.M. in the past, he had been in a psychiatric unit this year, and she had known him to be aggressive toward his sibling.

Boltz testified later before the ALJ that she indicated the report of abuse because C.M.'s version of the incident was consistent with her inquiries and corroborated by witnesses.  She described him as "a very small six-year-old" boy with two small scratches behind one ear and small reddish marks, of the type that abuse causes, behind the other ear and on the back of his neck.  C.M. informed her that he had been fighting with another student and that plaintiff escorted him to another room by placing a hand on the back of his neck.  After they were in the room, according to C.M., plaintiff pushed him into a corner and then placed his hands around his throat, choking him.  C.M. also informed her that plaintiff pushed him about five times and asked C.M., "[h]ow do you like it when you get pushed?"  

At the conclusion of the investigation, DCFS indicated the report of abuse.  In October 1998, DCFS denied plaintiff's request for expungement of the indicated report.  Plaintiff then requested a formal hearing. 

The State brought criminal charges against plaintiff for his actions related to the incident.  The trial was held several months after the incident.  Plaintiff was acquitted of the criminal charges.  Moreover, plaintiff points out that C.M.'s statements during plaintiff's criminal trial were not the same as those that C.M. made to Boltz after the incident and that C.M. did not at any point testify at the criminal trial that plaintiff's hands were around his neck.  

In February 1999, an ALJ conducted a formal hearing.  On June 15, 1999, the ALJ issued her decision.  Her findings of fact were as follows:

"(1) Although [C.M.] was involved in three altercations on March 10, only the altercation with appellant could have left the fresh bruises and scratch marks on [C.M.]'s neck.  The other altercations involved [C.M.] attacking the other person involved, rather than [C.M.] being attacked by them.

(2) The appellant's testimony, particularly as it related to his 'demonstrating by modeling' as opposed to acting in anger or frustration, was simply not credible."

She found that, in this case, DCFS "has shown by a preponderance of the evidence that the appellant inflicted abuse[-]level injuries upon [C.M.]" and recommended denying plaintiff's request for expungement of the indicated report of abuse.  On June 23, 1999, the Director issued a decision adopting the ALJ's findings and recommendation.  

In July 1999, plaintiff filed a complaint for judicial review of DCFS' decision not to expunge the indicated report, arguing that it was against the manifest weight of the evidence and contrary to law.  

In June 2000, the circuit court reversed the agency's decision and stated as follows:

"The standard of review in this action is whether the Director's decision that [DCFS] had met its burden of proof to prove the existence of abuse or neglect by a preponderance of the evidence is supported by the manifest weight of the evidence.

The [ALJ's] decision, adopted by the Director[,] was based on the following finding of fact:

'Although [C.M.] was involved in three altercations on March 10, only the altercation with appellant could have left the fresh bruises and scratch marks on [C.M.]'s neck.  The other altercations involved [C.M.] attacking the other person involved, rather than [C.M.] being attacked by them.'

The other finding of fact is irrelevant to the decision made as the [p]laintiff has no burden of proof.

The [c]ourt does not need to validate [p]laintiff's teaching methods or approach to behavior modification to determine the issue presented by this administrative review.  Rather[,] the only question is whether [DCFS] proved that [p]laintiff caused the marks on the back of the child's neck.  The finding that only the [p]laintiff could have left the fresh bruises and scratch marks is the basis upon which the indicated finding was sustained by [DCFS].  The [c]ourt determines that said finding was against the manifest weight of the evidence.  

In this decision[,] the [c]ourt is mindful that no witness testified that [p]laintiff touched the back (behind the ear) of the child's neck, that no witness having an opportunity to observe the child's neck immediately post[]occurrence observed marks on the back of the neck and that the child was involved in at least one altercation between the incident with [p]laintiff and the discovery of marks on the neck.

Judgment is awarded [p]laintiff on administrative review and the decision of [DCFS] is reversed."

Defendants appeal.

II. ANALYSIS

A. Standard of Review

Defendants assert that the Director's decision was not against the manifest weight of the evidence, nor were the factual findings contrary to law.  Administrative agencies possess only such authority as is legally conferred by express provisions of law or such, by fair implication and intendment, as is incident to and included in authority expressly conferred for the purpose of carrying out and accomplishing the objective for which agencies were created.  
Lenard v. Board of Education of Fairfield School District No. 112
, 57 Ill. App. 3d 853, 863, 373 N.E.2d 477, 484 (1978), 
aff'd
, 74 Ill. 2d 260, 384 N.E.2d 1321 (1979); Ill. Const. 1970, art. IV, §1.  The findings and conclusions of an administrative agency on questions of fact are held to be 
prima
 
facie
 true and correct.  735 ILCS 5/3-110 (West 1998); 
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 204, 692 N.E.2d 295, 302 (1998).  The findings of the administrative agency on questions of law, by contrast, are not binding on this court.  
DiFoggio v. Retirement Board of the County Employees Annuity & Benefit Fund
, 156 Ill. 2d 377, 381, 620 N.E.2d 1070, 1072 (1993). 

In reviewing an administrative agency's decision, the circuit court's role, as ours, is restricted to ascertaining "whether the findings and decisions of the agency are against the manifest weight of the evidence."  
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992).  "[O]nly if the opposite conclusion is clearly evident" is the agency's decision against the manifest weight of the evidence.  
Abrahamson
, 153 Ill. 2d at 88, 606 N.E.2d at 1117.  "If there is anything in the record which fairly supports the agency's decision, such decision is not against the manifest weight of the evidence and must be sustained upon review."  
Grams v. Ryan
, 263 Ill. App. 3d 390, 396, 635 N.E.2d 1376, 1380 (1994), citing 
Christiansen v. Edgar
, 209 Ill. App. 3d 36, 43, 567 N.E.2d 696, 700 (1991).  To find an agency's decision against the manifest weight of the evidence, the court must determine, after viewing the evidence in the light most favorable to the agency, that no rational trier of fact could have agreed with the agency's decision.  
Christiansen
, 209 Ill. App. 3d at 43, 567 N.E.2d at 700.

We will carefully consider and review each finding of fact to ensure that such is not against the manifest weight of the evidence.  However, we do not substitute our judgment for that of the administrative agency on fact findings, and we will not reverse the administrative findings, based on the "mere fact that an opposite conclusion is reasonable or that [we] might have ruled differently."  
Abrahamson
, 153 Ill. 2d at 88, 606 N.E.2d at 1117.  Moreover, the power and duty in courts to determine if administrative findings and orders have support in the evidence is not a power to hear new evidence or to reweigh the evidence adduced before the administrative agency.  
West End Savings & Loan Ass'n v. Smith
, 16 Ill. 2d 523, 525-26, 158 N.E.2d 608, 609 (1959).

B. Finding of Abuse

As we pointed out in 
Cavarretta v. Department of Children & Family Services
, 277 Ill. App. 3d 16, 22, 660 N.E.2d 250, 254 (1996), being placed on the State register of suspected child abusers implicates a liberty interest.  A subject of an "indicated" report may be prohibited from working in certain professions, such as child care and teaching.  225 ILCS 10/8(9) (West 1998). In addition, a teacher placed on the State register may have a difficult time retaining or acquiring a teaching position.  
Cavarretta
, 277 Ill. App. 3d at 22, 660 N.E.2d at 254.  A teacher placed on the State register of suspected child abusers may lose his teaching certificate.  105 ILCS 5/21-23(b) (West 1998). 

Plaintiff argues, among other things, that the injuries that C.M. suffered do not qualify as cuts or bruises as defined by DCFS regulation, and thus an indicated finding of abuse is error.  Plaintiff points to 
Korunka v. Department of Children & Family Services
, 259 Ill. App. 3d 527, 631 N.E.2d 759 (1994), for support.  In 
Korunka
, 259 Ill. App. 3d at 532, 631 N.E.2d at 762, this court held that a finding of abuse by DCFS was against the manifest weight of the evidence and, although the teacher's actions there did leave a mark, the injury did not amount to abuse.  There,
 a teacher with no prior indicated reports caused bruising on the shoulders and neck of a junior high school student with behavioral problems when he held the student down in his seat for his own safety and that of other students.  
Korunka
, 259 Ill. App. 3d at 528-30, 631 N.E.2d at 760-61.  The case at hand is similar in that C.M., a student with behavioral problems, struck another student and plaintiff intervened in the altercation.  The ALJ then found that plaintiff left marks on C.M.'s neck either during the walk to the Quiet Room or while in the Quiet Room.

We hold the finding of abuse is against the manifest weight of the evidence.  First, as the DCFS regulations state, not every bruise results in a finding of harm.  89 Ill. Adm. Code §300 app. B (West CD-ROM December 1998).  Although the ALJ did find plaintiff left the marks on C.M., such action does not necessarily amount to abuse.  "Beyond the regulation which states not every bruise amounts to abuse, the [Abused and Neglected Child Reporting Act (Ill. Rev. Stat. 1991, ch. 23, pars. 2053(a), (e)
] requires for a finding of abuse 'death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function,' substantial risk of such injury, or corporal punishment which is 'excessive.'"  
Korunka
, 259 Ill. App. 3d at 532, 631 N.E.2d at 762.  The actions here by plaintiff perhaps caused marks but did not cause death, disfigurement, any impairment of health, or any loss of bodily function.  His actions did not constitute excessive corporal punishment.  Plaintiff's actions do not amount to "abuse" under the statute.  

III. CONCLUSION

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

STEIGMANN, P.J., and MYERSCOUGH, J., concur.